UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| VICTOR VALENZUELA, | Case No. 2:23-cv-01477-GMN-BNW |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| GK NEVADA LLC, et al., | |
| Defendants. | |

Plaintiff brings this employment discrimination suit against his former employers based on allegations of race discrimination. *See generally* ECF No. 1. Defendants move to compel arbitration and ask the Court to either stay or dismiss Plaintiff's claims. ECF No. 15. Plaintiff responds that the Court should deny Defendants' Motion because he contends that he never signed the arbitration agreement. ECF No. 18. Defendants reply that they have shown, based on a preponderance of the evidence, that the parties entered said agreement. ECF No. 28.

Because Plaintiff fails to raise a genuine issue of material fact as to his signing of the arbitration agreement, the Court recommends that Defendants' Motion be granted, and that Plaintiff's claims be stayed or dismissed.

**I.    ANALYSIS**

The Federal Arbitration Act ("FAA") "establishes a federal policy favoring arbitration, requiring that [courts] rigorously enforce agreements to arbitrate." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). It provides "'that where [a] contract contains an arbitration clause, there is a presumption of arbitrability.'" *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) (quoting *AT & T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). "By its terms, the Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron Corp. v.*

*Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

The district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at 1130. In answering these questions, the court must "interpret the contract by applying general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).

The party seeking to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by [a] preponderance of the evidence." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1005 (9th Cir. 2010) (internal quotation marks and citation omitted). "When considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, [the Court] should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Mwithiga v. Uber Techs., Inc.*, 376 F. Supp. 3d 1052, 1059 (D. Nev. 2019) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)).

Under § 4 of the FAA—in response to a motion to compel arbitration—the district court must "hear the parties." 9 U.S.C. § 4. If the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* But "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.* In applying this language, district courts rely on the summary judgment standard of Federal Rule of Civil Procedure 56. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 n.1 (9th Cir. 2021) (collecting cases). "The summary judgment standard is appropriate because the district court's order compelling arbitration 'is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" *Id.* at 670 (citing *Par-Knit Mills, Inc.*

1 | *v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980), *abrogated on other grounds by*
2 | *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 287–88 (3d Cir. 2017)).

Here, Plaintiff does not dispute the scope of the arbitration agreement, or whether it encompasses his claims. *See* ECF No. 18. Instead, he contends that no arbitration agreement was made between the parties because he did not sign the arbitration clause. *Id.* at 4–5. Thus, the Court must simply decide whether Plaintiff has raised a genuine issue of material fact as to his signing of the arbitration agreement. *Hansen*, 1 F.4th at 670. If the Court finds that he has, it must summarily proceed to a bench trial on the issue. 9 U.S.C. § 4; *see also Mayorga v. Ronaldo*, 491 F. Supp. 3d 840, 855, 860 (D. Nev. 2020). But if the Court finds that he has not, it must grant Defendants' Motion and order the parties to arbitration. 9 U.S.C. § 4.

**A. The Existence of an Arbitration Agreement**

In their Motion, Defendants attached the subject arbitration agreement, which consists of two documents: (1) the "Employee Acknowledgment and Agreement," and (2) the "Comprehensive Agreement Employment At-Will and Arbitration." ECF No. 15-2 at 4–7. Each document is dated March 31, 2014, and contains what appears to be Plaintiff's signature. *Id.* The first document also includes Plaintiff's supposed printed name. *Id.* at 5.

Plaintiff disputes these signatures because he contends that he did not sign either document. ECF No. 18 at 4. He suggests that the arbitration agreement is "fundamentally flawed and lack[s] legitimacy" because the "signatures present on the documents bear no resemblance to his own." *Id.* Plaintiff's former business attorney submits that he does not recognize the signatures, and Plaintiff's handwriting expert found that it was "inconclusive" whether Plaintiff signed the documents. *Id.* Though Plaintiff does not offer a specific theory as to how his signatures ended up on the documents, he broadly posits that Defendants' "questionable business practices" make it "even more likely" that Defendants would sign on Plaintiff's behalf "by attempting to copy his own signature," and that "it is entirely possible" that Plaintiff's "other signatures were used as a model for the signature affixed." *Id.* at 4–5. According to Plaintiff, Defendants' "secretive and coercive tactics" created an environment "where such underhanded actions as manufacturing fictitious agreements could occur." *Id.* at 4. This, Plaintiff argues, casts

1   "significant doubt about the legitimacy" of the arbitration agreement and "suggests that the signatures. . . might not be his." *Id.* at 2.

    Defendants respond that it is their ordinary business practice to require all employees, upon intake, to attend orientation and complete a series of paperwork, which always includes the arbitration agreement. ECF No. 28 at 2. They allege that Plaintiff's contention that he did not sign the documents is contrary to their intake processes—which have been confirmed by their Business Managers—and that this assertion is supported by his word alone. *Id.* at 3. Defendants assert that their handwriting expert's report, which examined documents from Plaintiff's personnel file, bolsters the existence of a valid arbitration agreement because she found that Plaintiff wrote the signatures on the documents. *Id.* at 2. Thus, Defendants contend, they have met their burden of showing that it is "more likely than not" that Plaintiff signed the documents. *Id.*

    The Court considers the parties' arguments and evidence under a summary judgment standard. *Hansen*, 1 F.4th at 670. Thus, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable factfinder could find in his favor. *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *see also Mayorga*, 491 F. Supp. 3d at 855 (finding that party disputing arbitration clause presented "evidence from which a reasonable trier of fact could conclude that she lacked the mental capacity to contract."). The mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient to establish a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court summarizes, and then evaluates, the parties' evidence below.

### 1. *Declarations*

Each party submitted declarations along with their briefing. Under Rule 56(c)(4), "a declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).

Plaintiff includes two declarations: one from himself, and another from Attorney Piero C. Dallarda. ECF Nos. 18-1, 18-2. Plaintiff states in his declaration that he "can say without a doubt that the signatures listed on both agreements are not [his] signatures" because he "never signed these documents as part of [his] intake." ECF No. 18-1 at 2–3. He submits that "[t]o the best of [his] knowledge, neither of these documents were presented to [him] at the time of his employment," and that the signatures "do not match [his] routine signature that [he has] used for [his] entire life." *Id.* at 3. Attorney Dallarda, who represented Plaintiff and his former California business, states that he does not recognize the signatures on the arbitration agreement because they "do[] not bear a resemblance at all to the signature in documents on file with [his] firm." ECF No. 18-2 at 3–4.

Defendants also submitted two declarations, each from an employee who served in the Business Manager role. ECF Nos. 15-2, 28-2. The first comes from Christine Tracy, who is the current Business Manager, and states that the arbitration agreement attached to Defendants' Motion—*i.e.*, the Employee Acknowledgment Agreement and the Comprehensive Agreement Employment At-Will and Arbitration—was taken directly from Plaintiff's personnel file and that Defendants maintain these records in their ordinary course of business. ECF No. 15-2 at 2. The second, from then-Business Manager Michelle Bredin, submits that when Plaintiff was hired, employees were given a packet of materials and forms to sign during onboarding, which included the arbitration agreement, and that she has no reason to believe that Plaintiff was exempt from this routine process. ECF No. 28-2 at 106.

### 2. Expert Reports

The parties also submitted reports from handwriting experts. ECF Nos. 18-3, 28-2. Though neither party disputes the admissibility of the other's expert report, the Court nonetheless has an independent duty to ensure that the reports satisfy Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (holding that the "judge *must* determine at the outset" the expert's admissibility under Rule 702) (emphasis added); *Reed v. Lieurance*, 281 F. Supp. 3d 1058, 1070 (D. Mont. 2017) ("under Rule 702, the district court has an

independent duty to ensure that such testimony is both relevant and reliable."). The Court therefore discusses the reports' relevance and reliability below.

Federal Rule of Evidence 702 governs the admissibility of the expert opinions. FED. R. EVID. 702. The analysis under Rule 702 is "flexible" and district courts are instructed to apply the rule "with a liberal thrust favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (cleaned up). The proponent of the expert's testimony must establish that it is admissible and, if it is, even "shaky" evidence should not be excluded—rather, it should be "attacked by cross examination, contrary evidence, and attention to the burden of proof." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *United States v. 87.98 Acres of Land More or Less in the Cnty. of Merced*, 530 F.3d 899, 904 (9th Cir. 2008).

So a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" (a) "the expert's scientific, technical, or other specialized knowledge will help" the fact finder "understand the evidence or determine a fact in issue"; (b) the "testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. The touchstones of the expert testimony inquiry are thus relevancy and reliability. *Primiano*, 598 F.3d at 565. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (cleaned up).

There is no "general pronouncement that in this Circuit handwriting analysis is reliable." *United States v. Prime*, 431 F.3d 1147, 1152 (9th Cir. 2005). Instead, judges should evaluate the reliability of expert testimony using a "case-by-case review." *Id.*

Here, Plaintiff submitted an expert report from Mike Wakshull, who is an expert in forensic document examination, and Defendants submitted an expert report from Kathleen Annunziata Nicolaides, who is also a Forensic Document Examiner. ECF Nos. 18-3, 28-2. The Court finds that the reports are relevant because they will help the Court determine whether Plaintiff signed the agreements. *See* FED. R. EVID. 702(a).

1       In terms of reliability, each expert applied similar principles and methods to a sample of
2  signatures. *See* FED. R. EVID. 702(b)–(d). The experts noted that handwriting samples can be
3  compared because no two individuals share the same combination of handwriting characteristics.
4  ECF Nos. 18-3 at 9, 28-2 at 4. They explained that by examining the unique combination of
5  characteristics, they could then compare the structure of known signatures to the structure of
6  questioned signatures. ECF Nos. 18-3 at 9, 28-2 at 3. They also described processes for
7  determining whether a signature was forged, such as determining whether a signature was written
8  with a pen or electronically placed and looking for indications of a "forger's tremor." ECF
9  Nos. 18-3 at 11, 28-2 at 3. The experts also certified that their opinions conformed to the industry
10 standard SWGDOC "Standard Terminology for Expressing Conclusions of Forensic Document
11 Examiners." ECF Nos. 18-3 at 7, 28-2 at 8.

12      Based on these factors, which were thoroughly set forth by each expert, the Court finds
13 that the experts have a reliable basis in the knowledge and experience of forensic document
14 examination. *See Primiano*, 598 F.3d at 565. Such a finding is consistent with other Circuits "that
15 have addressed the admissibility of handwriting expert testimony and determined that it can
16 satisfy the reliability threshold." *Prime*, 431 F.3d at 1154 (collecting cases). Because the Court's
17 independent review demonstrates that each expert is relevant and reliable, the Court may consider
18 the reports at this stage. *Safeco Ins. Co. of Am. v. Air Vent, Inc.*, 616 F. Supp. 3d 1079, 1086 (D.
19 Nev. 2022) (finding expert reports admissible at summary judgment stage where the "expert
20 witnesses can testify about the opinions expressed in their expert reports").

21      Plaintiff's expert, Mr. Wakshull, compared photocopies of the three "questioned"
22 signatures that appeared on the arbitration agreement to photocopies of 27 "known" signatures
23 that Plaintiff submitted himself. ECF No. 18-3 at 5. The signatures ranged from 1980 to 2023, but
24 none were written within a year of 2014, the year the arbitration agreement was purportedly
25 signed. *Id.* at 7. In terms of time, the closest signatures were executed in 2011 and 2017. *See id.*
26 at 6. From examining the known signatures, Mr. Wakshull concluded that Plaintiff had two
27 methods of signing his name. *Id.* at 10. And in comparing the questioned signatures to the known
28 signatures, he observed that there were similarities, but also differences. *Id.* at 11. But due to

deficiencies—including lack of contemporaneous exemplars and the inability to examine original copies—Mr. Wakshull found an "inconclusive" result, which means the "evidence is not persuasive" of whether Plaintiff did or did not write the signatures. *Id.* at 7, 11.

Defendants' expert, Ms. Annunziata Nicolaides, compared original copies of the three "questioned" signatures from the arbitration agreement—along with Plaintiff's printed name and the date—to 57 "known" signatures appearing on original copies of documents in Plaintiff's personnel file. ECF No. 28-2 at 4. The known signatures ranged from 1980 to 2022 and several were written the same day as the arbitration agreement. *Id.* at 4–5. After examining the known signatures from Plaintiff's personnel file, Ms. Annunziata Nicolaides found that Plaintiff used three different styles of signatures, most prominently those categorized as "Group A." *Id.* She also observed, upon reviewing Mr. Wakshull's report, that most of the signatures Plaintiff submitted to him represented a fourth signature style. *Id.* at 5. In reviewing the questioned signatures along with the printed name and dates, Ms. Annunziata Nicolaides concluded that all were freely and naturally written, and that all were written with a pen. *Id.* at 5, 8. And in comparing the questioned group to the known group, she found significant similarities between the questioned signatures and known Group A signatures along with significant similarities between the questioned handprinted names and dates and the known names and dates. *Id.* at 5. After considering Mr. Wakshull's report, she also observed that some of Plaintiff's submitted signatures contained similarities to the Group A signatures. *Id.* at 6. From all this, she concluded that Plaintiff "*wrote*"[1] the signatures, as well as the handprinted name and dates, on the arbitration agreement. *Id.* at 8 (emphasis in original).

\* \* \*

In evaluating each party's arguments and evidence, the Court finds that Plaintiff fails to raise a genuine issue of material fact as to whether he signed the arbitration agreement.

---

[1] The SWGDOC standards defines an "identification (definite conclusion of identity)" as "the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatsoever, and although prohibited from using the word 'fact,' the examiner is certain, based on evidence contained in the handwriting, that the writer of the purported material actually wrote the writing in question."

*First*, Plaintiff simply contends that he did not sign the agreement. ECF Nos. 18 at 4, 18-1 at 2–3. But this assertion is supported by his declaration alone, and a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997) (citations omitted). In contrast, Defendants' declarations directly belie this claim as they demonstrate that it was standard practice for all employees to sign the agreement during onboarding, that Plaintiff was not exempt from this process, and that the documents constituting the arbitration agreement were pulled directly from Plaintiff's own personnel file. ECF Nos. 15-2, 28-2. Simply averring that he did not sign the agreement is not enough. *Mwithiga v. Uber Techs., Inc.*, 376 F. Supp. 3d 1052, 1060–61 (D. Nev. 2019) (plaintiff did not raise genuine issue where he was "adamant" that he did not press "agree" but provided little evidence to refute electronic agreement); *King v. Robertson*, No. 321CV00471ARTCLB, 2022 WL 4466201, at *3–4 (D. Nev. Sept. 23, 2022) (declaration from HR professional regarding ordinary business practices sufficient to refute allegation that plaintiff "was not presented" with agreement).

*Second*, Plaintiff broadly alludes to Defendants' "questionable business practices" to suggest that they "might have copied his signature" by using his other signatures as a "model." ECF No. 18 at 4–5. But in theorizing such forgery, Plaintiff does not discuss whether he disputes the validity of the signatures or handwriting on other documents in his personnel file, so it unclear which signatures he believes Defendants may have copied. Overall, Plaintiff does not have a coherent theory for how the signatures ended up on the documents. And upon examination of the complaint, the Court is unsure of which "questionable business practices" would lend an inference to Defendants forging Plaintiff's signature, as his claims are primarily based on allegations of inappropriate racial remarks. *See generally* ECF No. 1. Plaintiff does not point to specific allegations within the complaint to support this theory, and there are no allegations of forgery in general. *See id*. But most importantly, this allegation is directly undermined by Defendants' expert, who found no evidence that the questioned signatures were forged after examining the original documents. ECF No. 28-2 at 5, 8 (signatures were signed in pen and "freely and naturally written"). Thus, this too does not raise a genuine issue of material fact.

*Gonzales v. Sitel Operating Corp.*, No. 219CV00876GMNVCF, 2020 WL 96900, at *3 (D. Nev. Jan. 7, 2020) (contention that signature must have been "forged on the contract" and "placed in the business records of Defendant" insufficient to refute evidence from HR professional that plaintiff electronically signed agreement).

*Finally*, Plaintiff argues that the signatures on the arbitration agreement "bear no resemblance" to his signature because they "do not match [his] routine signature that [he has] used for [his] entire life." ECF Nos. 18 at 4, 18-1 at 2. But Plaintiff's own expert, who examined signatures that Plaintiff submitted himself, found that Plaintiff had *two* methods of signing his name. ECF No. 18-3 at 10. And Defendants' expert identified *four* different signature styles. ECF No. 28-2 at 4–5. Plaintiff's expert also found—due to admitted deficiencies—that it was inconclusive whether Plaintiff signed the arbitration agreement. ECF No. 18-3 at 7, 11. But Defendants' expert—who examined original documents from Plaintiff's personnel file that included many contemporaneous signatures—found, with the highest degree of certainty, that Plaintiff wrote the contested signatures. ECF No. 28-2 at 8. Though Plaintiff's business attorney also submitted that he did not recognize Plaintiff's signatures on the arbitration agreement, ECF No. 18-2 at 3–4, the Court assigns little weight to this declaration because Plaintiff submitted his own handwriting expert who is better suited to opine on such a topic. *See* ECF No. 18-3. The evidence therefore shows that it is "more likely than not" that Plaintiff signed the agreement.

Because Plaintiff's evidence does not raise a genuine issue of material fact regarding his signing of the arbitration agreement, and Defendants have demonstrated the existence of the agreement by a preponderance of the evidence, the Court recommends granting Defendants' Motion. *See* 9 U.S.C. § 4; *Hansen*, 1 F.4th at 670. The Court also recommends that the case be stayed, or that Plaintiff's claims be dismissed. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1276–77 (9th Cir. 2006) ("If a district court decides that an arbitration agreement is valid and enforceable, then it should either stay or dismiss the claims subject to arbitration.").

## II. CONCLUSION

**IT IS THEREFORE RECOMMENDED** that Defendants' Motion to Compel Arbitration (ECF No. 15) is **GRANTED**.

**IT IS FURTHER RECOMMENDED** that Plaintiff's case is **STAYED** or **DISMISSED without prejudice**.

### NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED this 26th day of June 2024.

_____
BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE